10 So.2d 666

## CITY OF BIRMINGHAM v. WOOD.

### 6 Div. 32.

Supreme Court of Alabama.

Nov. 27, 1942.

Basil A. Wood, of Birmingham, for appellee.

Wm. L. Clark, of Birmingham, for appellant.

FOSTER, Justice.

The questions presented on this appeal hinge upon a proper application and disbursement of what is termed the municipal stadium fund of the city of Birmingham, created under the following circumstances:

The Park and Recreation Board of the city of Birmingham was created by an

Act of the Legislature of 1923, General Acts 1923, page 707, see Title 62, section 721, Code of 1940. It is an arm of the city government and in that capacity only serves the municipality. It does not own the property and has no separate corporate existence.

In 1926 there was a proposal inaugurated by the Junior Chamber of Commerce of the city of Birmingham for the construction of a municipal stadium. It was contemplated that a structure which would seat as many as 25,000 would approximately cost $250,000. After negotiations with the Park and Recreation Board and the City Commission, a resolution was passed on December 22, 1926, by the board and on the same date the City Commission passed a resolution looking to the construction of the stadium.

The resolution of the Park Board was approved by resolution of the City Commission, and contained as a part of its preamble a recital of the fact that certain citizens of Birmingham proposed to furnish $100,000 to go into the construction of the stadium. Whereupon it was resolved with the approval of the City Commission of the city of Birmingham, and upon a pledge of the City Commission of an advance not to exceed $150,000, that the city shall erect a concrete stadium to seat not less than 25,000, and to maintain and operate it, and that a stadium fund shall be set up by the city of Birmingham which shall constitute a trust fund into which shall be deposited all the gross income derived from the use of the stadium, and out of which shall be paid certain amounts in the order of their priority, as follows:

(a) Proper and reasonable expenses of maintaining, repairing, and operating the stadium and its equipment.

(b) Repayment to the city, without interest, of such funds as it shall have advanced for the construction and equipment of the stadium.

(c) Payment and retirement of the certificate with interest at five percent. from date as thereinafter described.

Such resolution declared in paragraph four that it was contemplated that $100,000 was to be raised through the Junior Chamber of Commerce by the sale of 1,000 city of Birmingham certificates in the denomination of $100 each, and in form as prescribed in the resolution. The form of the certificate did not express any limitation on the amount to be advanced by the city, as set out in other features of the resolution, but broad terms were used in declaring its priority of payment, so that the city was to be repaid in priority to the certificates "such funds as it has advanced for the building and equipment of the said stadium." The certificates were not a general obligation of the city, and were payable only out of the stadium fund.

The resolution of the City Commission adopted at the same time assented to all the terms and conditions of the resolution of the Park and Recreation Board, and resolved to advance to the stadium fund such amount as shall be necessary for the construction of the stadium after exhaustion of the $100,000, "but in no event to exceed $150,000."

At this time technical estimates had not been made as to the cost of the contemplated structure, and the sum of $250,000 appeared to be merely the unofficial estimate of interested parties.

It developed that the stadium cost $108,000 more than was contemplated, and that instead of the city advancing $150,000, as was pledged, it advanced $258,000. The stadium was completed in 1928, and has been in operation ever since under the direction of the Park and Recreation Board, and the stadium trust fund has been administered through the general treasury of the city. The seating capacity of it, as finished, was approximately 21,000.

The bill in equity was filed by this appellee in 1935 whereby some of the expenditures made out of this trust fund are questioned, and whereby a construction is sought of the rights of the certificate holders in connection with those of the city under the priority provisions of the resolution and certificates. Appellee is a certificate holder. He claims that under the resolutions and terms of his certificate the proceeds of the trust fund should be used in paying the city in priority over the rights of the certificate holder only to the extent of $150,000, and that when that amount shall be paid the certificate holders are entitled to be reimbursed with interest at five percent. until they are paid, and only then is the city entitled to be reimbursed out of such fund for the remainder advanced over the $150,000.

The broad terms of the priority feature of the resolution and certificate taken alone tend to show that the city should have priority of payment over the certificate holders to the extent of the entire sum advanced by it though it may exceed $150,000.

The city contends that such is its meaning ~ven when construed in connection with the resolution in which the form of the certificate is set up. And that when the resolution of the board refers to a pledge to be made by the city to advance not to exceed $150,000, and when the resolution of the City Commission resolved to advance such amount as shall be necessary after exhausting the $100,000, supra, "but in no event to exceed $150,000," it was meant thereby to limit the obligation to $150,000, but not to limit the power of the city to exceed that amount, and that the certificate holders are bound to understand that such was its purpose, and that the priority extended to the full amount. The register found that "this provision (limitation to $150,000) of the said resolution was a material inducement to the purchasers of stadium certificates and is an integral part of the contract between the city of Birmingham and the stadium certificate holders."

■ This conclusion is predicated on the terms of the two resolutions. It is therefore a legal question, and in it the trial court concurred and reflected that interpretation of the situation in the final decree. This is seriously challenged by appellant.

■ But we are in accord with that view. A prospective buyer of a certificate finds that the city declares that in no event will it advance more than $150,000. It could be less than that. So that if the amount is less, the priority will be only to the extent of the amount so advanced. But the buyer could well understand that, since the city declares that it will not advance exceeding $150,000: that sum was intended to limit the amount of its priority. That is not an unreasonable interpretation of a resolution which the city itself prepared and adopted using language of its own choice. It should be therefore strictly construed against the city. Penn Mut. Life Ins. Co. v. Fiquett, 229 Ala. 203, 155 So. 702; King v. Capitol Amusement Co., 222 Ala. 115, 130 So. 799; Shepherd Lumber Co. v. Atlantic Coast Line R. Co., 216 Ala. 89, 112 So. 323.

■ Appellant also contends that as trustee it would be authorized to incur the amount of this additional cost and thereby create a lien upon the estate payable out of the trust fund. But the city is only a trustee of the fund for disbursement as provided in the resolution, not of the property. The city otherwise was the owner of the property and continued to own and operate it as such owner in its own way, without material restrictive requirements or supervision, but with the proviso that the funds derived from its use were to be held in trust and applied pursuant to the terms of the resolution.

This constituted a material agreement between the city and the certificate holders, whereby the latter would be paid out of the fund only after the city shall be reimbursed to the extent of $150,000. When that sum has been refunded to the city, and the certificate holders fully paid then the stadium and its revenue will belong to the city free from all other claims. When the city "advanced more than $150,000," it was merely improving its own property to that extent. It has since then continued to add improvements and equipment extending to an additional sum of approximately $100,000 (see, record page 197), as to which there is no contention of priority of payment. In doing this, the city was engaged in an undertaking to promote the general welfare and good will of its citizens, using public funds. The value is not subject to measurement in dollars and cents. It does not seem to us to be similar to a situation where a trustee borrows money to make necessary repairs or even improvements on the corpus of the estate. The city had no such authority to the extent of increasing the amount of its preferred claim beyond $150,000.

We find no error in the decree of the trial court in respect to the matter which we have discussed.

The register found also that $33,628.33, pursuant to stipulation, had been paid out of the stadium fund in 1928, 1929 and 1930 for the erection of a war memorial entrance or gateway to the stadium, which was not a proper prior claim out of that fund over that of the certificate holders. On pretrial this amount was by agreement reduced to $17,114.14, and on final decree the court deducted that sum from $150,000, in fixing the net amount of the city's prior claim.

In respect to the memorial gateway the register found the facts to be as follows:

"During the year 1929 a war memorial entrance or gateway was constructed or erected in McLendon Park, and on the same tract of land on which the stadium is located. The said entrance or gateway is located at the Fifth Avenue entrance to McLendon Park and immediately off of Fifth Avenue, and is approximately two hundred fifty (250) feet from the nearest

484

entrance or gate to the stadium, and in reality is not an entrance or gateway to the stadium proper. The cost of this project was thirty-three thousand, two hundred forty-six and 10/100 dollars ($33,246.10) all of which was paid from the stadium trust fund.

"The above expenditure from the stadium trust fund has been disallowed, inasmuch as same is not a proper item of expense of maintaining, repairing or operating the stadium and its equipment."

■ This result as modified by agreement of the parties is to us obviously correct. And since it was an advance in excess of the restricted sum of $150,000, it cannot have priority over the certificates as a part of the cost of the construction of the stadium under (b) of the priority clause.

The city also contends that there should be computed as disbursed for maintenance, repairs and operation under (a) in fixing the amount of the stadium fund for disbursement under (b) and (c) of the priority clause, an aggregate sum of $7,037.20 set out in a resolution of the board adopted in December, 1939, as there itemized, whereby said amount was refunded to the city's regular park fund out of the stadium fund on a finding and declaration that it represents proper and reasonable expenses incurred in maintaining, repairing and operating the stadium, but was primarily paid from the regular Park and Recreation Board fund. It was declared that:

"These employees were paid their regular salaries during all of said time shown in this resolution, which salaries were charged against the Park and Recreation Board general fund. No employee received any extra pay as a result of this transfer. None of the funds described in said resolution and voucher are shown on the annual report of the city of Birmingham published by the city of Birmingham for the separate periods ending August 31, 1937, August 31, 1938, and August 31, 1939, as an unpaid indebtedness of the municipal stadium fund; or claimed by the Park and Recreation Board as due to it by the municipal stadium fund."

"The Park and Recreation Board with assistance from other department heads, maintain a list of city employees under civil service regulations from the other city departments. From this list men are selected for off duty service at stadium games or activities as cashiers, gatemen and other incidental help. Most of these activities are commercial activities at which time ticket sales increase the stadium fund. Where no revenue is contemplated, but assistance at the stadium is necessary, services of employees are paid by the organization which sponsors the attraction. During the time these parties are off duty with their respective city departments, and render service at the stadium they are paid for such services at the rate of pay provided for their classification in their respective city departments; during the same dates, they are on the active pay roll as city employees for their respective departments; and the annual city budget and monthly payrolls published by the city for their respective department; which includes their contemplated pay for active employment for their respective departments.

"Employees used part time on active service for the Park and Recreation Board, and part time on the stadium as a general rule, have their salary prorated in an amount estimated by the Park Superintendent R. S. Marshall."

The court in the final decree held that said sum was improperly appropriated or diverted from the trust fund for the following reasons stated in that connection:

"The sum of $7,037.20 was disbursed from the trust fund February 14, 1940 and paid to the Park and Recreation Board to 'reimburse' it for salaries paid to certain Park and Recreation Board employees during part of the years 1937, 1938 and 1939. From the beginning of operations the stadium and other park projects were under the supervision of the Park and Recreation Board. During all the time down to and including the year 1939, the city of Birmingham had regularly appropriated from its general fund moneys with which to operate the Park and Recreation Board, including salaries for its employees. Yet, in late December, 1939, a resolution was passed by the Park and Recreation Board appropriating $7,037.20 from the trust fund to itself with which to 'reimburse' itself for salaries paid certain employees of the Park and Recreation Board for a portion of the years 1937, 1938, and 1939. The court is of the opinion that such an appropriation (made years after the salary period) was improper, and resulted in the trustee unjustly enriching itself at the expense of the beneficiaries of the trust."

■ We are not in accord with that conclusion. The facts are evident and the con-

clusion is clear that the items aggregating the sum named were amounts paid employees for services rendered in maintaining, repairing or operating the stadium. We do not think the city should be barred of this credit because it had paid the claims out of other funds. If they were payable out of the stadium fund when they were paid, we do not see how this certificate holder can complain because they were not charged to that fund at the time of payment, but that the charge was made later.

The city also contends that the trial court erred in refusing to charge to the stadium fund the sum of $26,000 disbursed during the period of operation of the stadium of thirteen years, for services of policemen rendered upon the occasion of the amusements conducted in the stadium to the aggregate sum of $2,000, annually. The agreed facts stipulated as follows:

"Policemen are paid out of the stadium fund only when they work in the stadium during their off hours. The annual city budgets and appropriations include the contemplated regular salaries of the same policemen who are paid out of the stadium fund for services rendered in the stadium while they are off duty. The policemen performing such services in the stadium while off duty are listed in the annual advertising of the salaries of city employees for the police department. At large games it is customary to use as many as forty policemen who are paid out of the stadium fund at the same rate of pay prevailing in the police department for active duty shifts. They work an average of six hours for each stadium game. They are paid the same as they would be paid for active duty on one shift in the police department. Two-thirds of the policemen paid out of the stadium fund for services at the stadium are men who have worked on the morning shift preceding their employment at the stadium. The morning shift is from 11 P. M. to 7 A. M. The other one-third of such men paid out of the stadium fund are men who are working on their off days. In addition to the six hours spent in working at the stadium these policemen spend time in going to and returning from the stadium as a necessary incident to their work at the stadium. Two-thirds of such men work at the stadium when they would ordinarily be sleeping in the day-time because of their work during the night time.

"It is stipulated that the average annual amount paid from the stadium trust fund to policemen on this list; to secure the attendance of policemen off duty, amounts to $2,000 for each budget year since the opening of the stadium to this date.

"(C) Policemen Paid for Activities at Other Places:

"It is customary for all persons promoting any commercial event in the city, and desiring the presence of policemen at such event to pay the policemen for services there rendered. Illustrations are as follows: Commercial activities inside the municipal auditorium; the State fair (inside the grounds), and Southern League Baseball games. Officers who perform traffic duty at the circuses and at the baseball games are allowed to go in free. All officers are authorized to enter all events, on the authority of their badge.

"In Tuscaloosa, Alabama, the city of Tuscaloosa is paid by the University of Alabama for the services of policemen who act as guards for the ticket receipts. Other policemen for traffic and other purposes are assigned to duty at the stadium there, and enter on the authority of their badge."

■ The register disallowed said sum as an operating expense, and the court in the final decree held that such expenditure was not within the scope of the agreement of the parties allowing expenses for operating, maintaining and repairing the stadium. In this conclusion we cannot concur. It is an expense of operating the stadium, and it is over and above the ordinary expenses of the city. The policemen so paid are performing extra services and receive extra compensation, not a part of their regular salary, and when they are not otherwise on duty. This is not an unusual charge under such circumstances, and we think it was well within the terms and spirit of the agreement.

The decree of the trial court is hereby modified to conform to this opinion.

Modified and affirmed.

All the Justices concur.